

**SIGNED this 13 day of March, 2009.**

_____
R. Thomas Stinnett
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re

William Owen Westerfield                     Case No. 07-15526
                                             Chapter 13
    Debtor


MEMORANDUM


Appearances:    Kenneth C. Rannick, Chattanooga, Tennessee, Attorney for Debtor

              Rex A. Wagner, Cleveland, Tennessee, Attorney for Gloria Westerfield


R. Thomas Stinnett, United States Bankruptcy Judge


      This memorandum deals with the chapter 13 debtor's objection to a claim filed by his ex-wife, Ms. Westerfield. The divorce decree and the marital dissolution agreement awarded the marital home to Ms. Westerfield and ordered the debtor to pay the mortgage debt. Ms. Westerfield filed a proof of claim asserting an unsecured claim for the mortgage debt. The proof of claim also asserts the claim is entitled to first priority among unsecured claims because the debtor's duty to pay the mortgage is a

"domestic support obligation." 11 U.S.C. §§ 101(14A) & 507(a)(1). The debtor's objection asserts that his obligation to pay the mortgage debt is not a domestic support obligation.

In 1994 the debtor and Ms. Westerfield refinanced the debt secured by their home and executed a mortgage to American Home Mortgage. In August 1996 the debtor and Ms. Westerfield executed the marital dissolution agreement. The agreement awarded the house to Ms. Westerfield, divested the debtor of any interest in the house, and required him to execute the necessary documents conveying title to her. The agreement made the debtor responsible for paying the mortgage debt to Trans Financial in the approximate amount of $76,000, required him to indemnify and hold Ms. Westerfield harmless from liability on the mortgage debt, and provided that these obligations would be extinguished on the death or remarriage of Ms. Westerfield. The state court entered the divorce decree in September 1996 and adopted the marital dissolution agreement as part of the decree.

More than eleven years later, on December 19, 2007, the debtor filed his chapter 13 petition along with the required schedules and other documents. The schedule of real property identifies the house as jointly owned by the debtor and subject to a mortgage debt of $48,000. Schedule D identifies the mortgage holder as U. S. Bank Home Mortgage, but the mailing list includes two addresses for Wells Fargo Home Mortgage. It is undisputed that Wells Fargo was the mortgage holder when the debtor filed his chapter 13 case.

The debtor did not list Ms. Westerfield as a creditor in any of the schedules of creditors. The debtor scheduled her as a co-debtor on the mortgage debt. Under Ms. Westerfield's name and address, the schedule includes the notation "523(a)(15) CLAIM". The statistical summary of liabilities lists the mortgage debt among divorce obligations that are *not* entitled to priority as domestic support obligations.

The debtor's proposed chapter 13 plan treated U. S. Bank/Wells Fargo as the other party to an executory contract. It listed the house as the property dealt with by contract and provided for surrender to U. S. Bank/Wells Fargo.

The plan provided that priority claims would be paid in full unless a different treatment was set out in section 6 for a particular claim. Section 6 did not refer to Ms. Westerfield's claim. No other provision of the proposed plan mentioned Ms. Westerfield's claim.

Less than a month after the debtor filed his chapter 13 case, Wells Fargo Bank filed a motion for relief from the automatic stay imposed by the bankruptcy code. 11 U.S.C. § 362(a). The bank sought relief from the stay so that it could foreclose on the house. It demanded payment of the full balance due – $45,270.84. The motion alleged the debtor had failed to pay the full amount of the monthly mortgage payments. The court granted the motion on February 14, 2008.

On February 29, 2008 the court confirmed the debtor's chapter 13 plan. In early May 2008 Ms. Westerfield filed her proof of claim. Ms. Westerfield had refinanced the mortgage in late February or early March 2008 and paid the debt to Wells Fargo Bank. The amount of her claim is the amount that she paid, which was the amount Wells Fargo Bank demanded to avoid foreclosure – $45,270.84.

At this point, the court can deal with whether confirmation of the plan affected the priority of Ms. Westerfield's claim. An explanation of some basic legal rules will help to avoid confusion.

Bankruptcy law has long included an exception from discharge for the debtor's obligations that are actually in the nature of support for an ex-spouse or child. 11 U.S.C. § 35(a)(7) (1978); 1A James W. Moore, et al., *Collier on Bankruptcy* ¶ 17.19 (14th ed. 1988); 11 U.S.C. § 523(a)(5) (1979); 4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 523.11 (15th ed. 2008).

A 2005 law made several amendments to the bankruptcy code for the purpose of giving more protection to creditors owed support debts. Those amendments included the definition of domestic support obligation. Pub. L. 109-8, 119 Stat. 23 §§ 102, 211–219, 329 & 442 (Apr. 20, 2005); 11 U.S.C. §§ 101(14A), 362(b)(2), 503(b)(1), 507(a)(1), 523(a)(5), 547(c)(7), 704(a)(10), 707(c)(3), 1106(a)(8), 1112(b)(4)(P), 1129(a)(14), 1202(b)(6), 1208(c)(10), 1225(a)(7), (b)(2), 1228(a), 1302(b)(6), 1307(c)(11), 1325(a)(8), (b)(2) & 1328(a). The definition of domestic support obligation is now used in the discharge exception, § 523(a)(5) of the bankruptcy code.

The definition is used in other statutes that Congress intended to protect claims for support. In particular, an unsecured claim for a domestic support obligation is entitled to first priority in the payment of unsecured claims. 11 U.S.C. §§ 507(a)(1) & 1322(a)(2). When a domestic support obligation requires the debtor to make installment payments on a debt, such as a home mortgage, the statutes cause some confusion as to whether the priority claim is limited to installment payments that were due pre-petition – before the debtor filed his chapter 13 petition. The question is whether the payments coming due post-petition (during the chapter 13 case) are entitled to first priority. 11 U.S.C. §§ 507(a)(1), 101(14A) & 101(5). The court raises the point because the debtor made all the mortgage payments that were due pre-petition. Despite this fact, the parties recognized the need for a decision on the nature of the debtor's duty to pay the mortgage debt. An answer is needed because other statutes require a chapter 13 debtor to make post-petition payments on a domestic support obligation, as explained in the next paragraph.

The court cannot confirm the debtor's proposed chapter 13 plan if the debtor has failed to make all payments due post-petition on a domestic support obligation. 11 U.S.C. § 1325(a)(8) (if an order or statute requires the debtor to pay the domestic support obligation). The debtor's failure to pay a domestic support obligation that first becomes payable during the chapter 13 case is a ground for dismissal of the case or conversion to a chapter 7 liquidation. 11 U.S.C. § 1307(c)(11). If the debtor completes the confirmed plan, the debtor can obtain a discharge only by certifying full payment of the amounts previously due on a domestic support obligation. 11 U.S.C. § 1328(a) (if an order or statute requires the debtor to pay the domestic support obligation and certification as to pre-petition amounts only to the extent provided for by the plan). Finally, a domestic support obligation is excepted from discharge in a chapter 13 case even if the debtor completes the confirmed plan. 11 U.S.C. § 1328(a)(2) & (c). The statutes are clearly aimed at preventing discharge of any amounts owed on a domestic support obligation. *See generally* 5 & 6 Keith M. Lundin, *Chapter 13 Bankruptcy* ¶ 440.1, ¶ 441.1 & ¶ 519.1. In light of these statutes, the courts may seldom be bothered with the question of whether amounts or obligations that come due post-petition in a chapter 13 case are entitled to first priority.

Section 523(a)(15) is another exception from discharge for debts arising from a divorce. The exception is broad but applies only to obligations that are *not domestic support obligations*. 11 U.S.C. § 523(a)(15). Debts that come within § 523(a)(15) do not give the ex-spouse creditor a priority claim. 11 U.S.C. § 507(a)(1) & § 101(14A); *In re Boller*, 393 B.R. 569 (Bankr. E. D. Tenn. 2008). Debts that come within this exception will also be discharged if the debtor completes a chapter 13 plan. 11 U.S.C. §§ 727(a), 1141(d)(2), 1228(a) & 1328(a).

The debtor's schedules did not list Ms. Westerfield as holder of a priority claim for a domestic support obligation. They included a notation that Ms. Westerfield's claim came under § 523(a)(15) of the bankruptcy code. 11 U.S.C. § 523(a)(15). The statistical summary also identified Ms. Westerfield's claim as not based on a domestic support obligation. The point was to identify Ms. Westerfield's claim as *not* based on a domestic support obligation.

Under the marital dissolution agreement, the debtor had a separate obligation to Ms. Westerfield to pay the mortgage debt on the house, and she had a personal claim against him for payment of the mortgage debt. *McCracken v. Larue (In re Larue)*, 204 B.R. 531 (Bankr. E. D. Tenn. 1997); *Crawford v. Osborne (In re Osborne)*, 262 B.R. 435 (Bankr. E. D. Tenn. 2001) (indemnity clause not required). Ms. Westerfield had a pre-petition claim for the debtor's obligation to pay the mortgage debt. *See*, *e.g.*, *Schultz v. Schultz (In re Schultz)*, 204 B.R. 275 (D. Mass. 1996); *Altchek v. Altchek (In re Altchek)*, 124 B.R. 944 (Bankr. S. D. N. Y. 1991); *Beardslee v. Beardslee (In re Beardslee)*, 209 B.R. 1004 (Bankr. D. Kan. 1997).

Ms. Westerfield was required to file a proof of claim to receive payment under the plan as holder of an unsecured pre-petition claim. *See* 11 U.S.C. §§ 501, 502, 507(a)(1); *In re Elstein*, 238 B.R. 747 (Bankr. N. D. Ill. 1999). A timely filed proof of claim establishes the status of the claim until a party in interest files an objection to the claim. 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f). This rule applies even though Ms. Westerfield filed the proof of claim after confirmation of the chapter 13 plan. 11 U.S.C. § 502(a)(9) & § 1324; Fed. R. Bankr. P. 3002(c); 6 Keith M. Lundin, *Chapter 13 Bankruptcy* § 502.1 (3rd ed. 2006). The result of these rules is that confirmation of a chapter 13 plan usually does not adopt the

debtor's characterization of the claim in the schedules or the statistical summary. *Shook v. CBIC (In re Shook)*, 278 B.R. 815 (9th Cir. B.A.P. 2002).

Chapter 13 debtors have attempted to avoid this result by including language in a proposed chapter 13 plan for the purpose of setting the status of the creditor's claim. This allows the debtor to argue that confirmation of the plan was binding on the creditor as to the status of its claim in the chapter 13 case. The debtor's plan did not explicitly state that Ms. Westerfield's claim would not be treated as based on a domestic support obligation. The plan treated the mortgage holder as the other party to an executory contract and provided for rejection of the executory contract and surrender of the house to the mortgage holder. Rejection of the executory contract necessarily referred to the debtor's obligations under the note and mortgage. Surrender did not mean giving possession of the house to the mortgage holder; the debtor and the plan could not accomplish that because Ms. Westerfield had an interest in the house and possession. Surrender amounted to saying, "If I have any interest in the house and the interest came into the bankruptcy estate, then I will not rely on my interest to prevent the mortgage holder from foreclosing." The intended effects of the plan were clear: (1) the debtor would not make plan payments to cure any arrearage on the mortgage debt; (2) he would not continue making the regular monthly payments; (3) he consented to foreclosure by the mortgage holder if justified by other facts and the law; (4) the mortgage holder would have only a non-priority unsecured claim in the debtor's chapter 13 case. The plan's treatment of the mortgage debt was an indirect statement that the debtor did not recognize his separate obligation to Ms. Westerfield as a domestic support obligation.

The plan provisions could have been intended to raise the issue of whether the debtor's obligation is a domestic support obligation and to require Ms. Westerfield to litigate the issue during the confirmation process or lose by default. The proposed plan failed to give Ms. Westerfield sufficient notice of that intent. Even if the plan had given Ms. Westerfield sufficient notice, the court doubts that confirmation would have been a binding decision against Ms. Westerfield. The requirements of due process make it nearly impossible to incorporate some issues into the confirmation process. *In re Jackson*, 2007 WL 954751, Case No. 06-10655 (Bankr. E. D. Tenn. Mar. 29, 2007); *Ruehle v.*

*Educational Credit Mgmt. Corp. (In re Ruehle)*, 412 F.3d 679 (6th Cir. 2005); *In re Vankell*, 311 B.R. 205 (Bankr. E. D. Tenn. 2004). Confirmation of the plan did not decide that the debtor's duty to pay the mortgage debt is not a domestic support obligation.

These decisions bring the court back to the question of whether the debtor's duty to pay the mortgage debt is a domestic support obligation. Two provisions of the marital dissolution agreement appear to contradict each other on this point. Paragraph 5.1 states that the agreement makes no award of alimony. Tennessee law does not necessarily require the label "alimony" for an obligation to qualify as support, but the relevant Tennessee statute uses "alimony" to describe support for an ex-spouse. Tenn. Code Ann. § 36-5-121. As a result, the no-alimony provision can be taken to mean that the marital dissolution agreement does not impose on the debtor any obligation that would be treated as support for Ms. Westerfield within the meaning of Tennessee law.

On the other hand, paragraph 14.1 provides that the parties' obligations under the agreement will not be dischargeable in bankruptcy:

> 14.1 With respect to each parties' responsibility for the payment of certain debts and liabilities and their obligation to hold the other harmless for the payment thereof, the parties understand and agree that their obligation is a non-dischargeable debt under the bankruptcy code, this obligation being part of the final financial support settlement for both parties.

The traditional exception from discharge applies to a debtor's obligations that are actually in the nature of support for an ex-spouse or child. 11 U.S.C. § 35(a)(7) (1978); 1A James W. Moore, et al., *Collier on Bankruptcy* ¶ 17.19 (14th ed. 1988); 11 U.S.C. § 523(a)(5) (1979); 11 U.S.C. § 101(14A) & 523(a)(5); 4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 523.11 (15th ed. 2008). The federal courts have taken state law into account for the purpose of deciding whether an obligation is actually in the nature of support. *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103, 1106-1109 (6th Cir. 1983).

The two provisions of the marital dissolution agreement reflect the desire for different labels in different legal contexts. Under Tennessee law, the parties may label a support obligation as a property division to protect it from modification by the court. Tenn. Code Ann. § 36-5-121(a), (e)(2), (f)(2),

(g)(2), (h)(2); *Hannahan v. Hannahan*, 247 S.W.3d 625 (Tenn. Ct. App. 2007); *Wine v. Wine*, 245 S.W.3d 389 (Tenn. Ct. App. 2007). Federal tax law can also influence the parties' choice of the label used in the divorce decree or marital dissolution agreement. *In re Smith*, 436 F.Supp. 469 (N. D. Ga. 1977); *Carrigg v. Carrigg (In re Carrigg),* 14 B.R. 658 (Bankr. D. S. C. 1981).

The label used in the divorce decree or the parties' agreement does not control whether the obligation is a domestic support obligation under bankruptcy law. 11 U.S.C. § 101(14A); *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103 (6th Cir. 1983). Despite the no-alimony provision, the court can hold the debtor's obligation to be a domestic support obligation. *James v. Herbert (In re Herbert)*, 321 B.R. 628 (E. D. N. Y. 2005); *Thornton v. Thornton (In re Thornton)*, 331 B.R. 306 (Bankr. N. D. Ohio 2005). Despite the no-discharge provision, the court can hold the debtor's obligation is not a domestic support obligation and is not excepted from discharge by § 523(a)(5). *Light v. Adkins (In re Adkins)*, 151 B.R. 458 (Bankr. M. D. Tenn. 1992); *Lewis v. Trump (In re Trump)*, 309 B.R. 585 (Bankr. D. Kan. 2004); *Fifth Third Bank v. Baumhaft (In re Baumhaft)*, 271 B.R. 523 (Bankr. E. D. Mich. 2001).

The court must consider the entire divorce decree and marital dissolution agreement and other facts at the time of the divorce. The divorce decree was entered in September 1996. The marital dissolution agreement reveals that the debtor and Ms. Westerfield had been married for more than 28 years, their daughter and son were both over 18 years old, and the daughter was a twenty year old college student.

The marital dissolution agreement divided the property as follows:

<u>Ms. Westerfield</u>

Household furnishings and personal property except the personal property already divided with the debtor and specific items awarded to the debtor

Her individual retirement account

Her separate bank accounts

A 1992 Toyota car

Two recreational lots in Kentucky

> The timeshare rights for a condominium in Florida
>
> One-half of the debtor's military retirement pay
>
> The marital home

### Debtor

> A Hummel figurine, a teakwood chess table, a U. K. clock, a tool box, a tiller, mugs and beer steins, crystal decanters, and a decorative candle
>
> Other personal property set aside to him by agreement with Ms. Westerfield
>
> His individual retirement account
>
> His separate bank accounts
>
> A 1989 Mercury automobile
>
> A Honda motorcycle
>
> One-half of his military retirement pay

The marital dissolution agreement also directed the debtor to transfer to the children the titles to the cars they were using.

The agreement imposed some obligations on the debtor that did not involve paying debts incurred during the marriage:

> The debtor agreed to pay $150 per month for the support of their daughter during her college education and to continue her health insurance coverage until graduation.
>
> The debtor agreed to pay up to $10,000 in wedding expenses of the daughter.
>
> The debtor agreed to maintain a life insurance policy on himself with the face value of $100,000 and to designate Ms. Westerfield as the beneficiary and their children as contingent beneficiaries.
>
> The debtor agreed to maintain health insurance on Ms. Westerfield through his employer for a period of 36 months after the date of the final decree of divorce.

As to debts, the marital dissolution agreement provided:

> Each party will pay and hold the other party harmless as to individual debts not listed in the agreement.
>
> Ms. Westerfield will pay certain credit card debts totaling $6,830.00 and an education loan of $2,800.00 and will indemnify and hold the debtor harmless on the debts.
>
> The debtor will pay certain credit union loan debts totaling $15,977.00 and will indemnify and hold Ms. Westerfield harmless on the debts.
>
> The debtor will pay medical debts totaling $3,320.00 and will indemnify and hold Ms. Westerfield harmless on the debts.
>
> The debtor will pay the debt secured by the 1992 Toyota awarded to Ms. Westerfield and will indemnify and hold her harmless on the debt.
>
> The debtor will pay the mortgage debt on the house totaling about $76,000 and will indemnify and hold Ms. Westerfield harmless on the debt.

With regard to the mortgage debt, the marital dissolution agreement (1) made the debtor responsible for paying the mortgage debt in the approximate amount of $76,000; (2) required the debtor to indemnify and hold Ms. Westerfield harmless from liability on the mortgage debt; (3) provided that these obligations would be extinguished on the death or remarriage of Ms. Westerfield. The following indented paragraphs are the testimony of Ms. Westerfield and the debtor – except that the court has included some information regarding the debtor's bankruptcy case. The court has provided that information primarily to make the timing of events clear.

### Ms. Westerfield

> She wanted to keep the house, and the debtor agreed to make the payments. The debtor did not have a lawyer in the divorce proceedings. Ms. Westerfield's lawyer drafted the marital dissolution agreement. In the process of negotiating the terms, the debtor asked her about designating the mortgage payments as alimony. Her lawyer advised against it because it would increase her income tax liability. As a result, the marital dissolution agreement ended up with the no-alimony provision. The debtor also asked her about terminating the obligation to pay the mortgage debt on her death or

remarriage, instead of requiring him to pay the entire debt. She agreed; she did not think the change was worth fighting over. The main point of the agreement was to allow her to remain in the house. She did not recall any discussion of bankruptcy or the no-discharge provision.

When she and debtor separated, both children were in college. The son graduated in 1995 before the divorce, and the daughter graduated in 1996, the year of the divorce. Ms. Westerfield finished her residency in clinical pastoral education and moved back into the house around September 1996. She had no income at the time of the divorce in September 1996 other than one-half of the debtor's military pension as provided in the marital dissolution agreement. She found work in November 1996 but was minimally employed.

The agreement required the debtor to keep a life insurance policy for her benefit. The benefit was intended to replace her half of the military pension, which would terminate on the death of the debtor.

The mortgage payments varied but were $750 to $800 per month. The debtor made the payments from the time of the divorce in September 1996 through December 2007 when the debtor filed his bankruptcy case. The debtor called her in December 2007 and told her that he would not make the mortgage payments after December 2007. Nevertheless, he paid the January 2008 payment. She could not remember if he paid the February 2008 payment. On January 10, 2008, the mortgage holder filed a motion in the debtor's chapter 13 case for relief from the automatic stay so that it could foreclose on the house. The motion alleged that the debtor had failed to pay the full amount of the payments due on the mortgage debt.

After the debtor told Ms. Westerfield that he would stop paying, she went back to the law firm that handled the divorce. She found out that they could not go ahead in state court. She wanted to refinance the mortgage debt, but that was delayed because

the house was held in foreclosure. She had to wait until all that was settled before refinancing. She refinanced and paid off the mortgage debt in late February or early March 2008. As far as she knew and could find out from the mortgage holder, the mortgage payments were always current.

### The Debtor

He wanted Ms. Westerfield to have the house and was willing to pay for it. He wanted to provide her a place to live, "a roof over her head."

At the time of the divorce, their son was married and attending graduate school at the University of Tennessee. The daughter was also attending the University of Tennessee and lived away from home in a dormitory or apartment.

He asked about designating payments as alimony for tax purposes, but her lawyer advised against it for tax reasons.

During the marriage, she had worked as a medical technician and made about $30,000 annually. He thought that she was working and going to school part time at the time of the divorce. She quit work and moved to Indiana to do a required internship for her new certification and career. She had no income during the internship. He thought that she moved and did the internship after the divorce.

He was earning about $40,000 annually at the time of the divorce and also receiving his military pension payments. After the divorce he scraped and scrimped so that he could make the house payments. He would still be making the house payments except for financial problems that led to his bankruptcy. The problems arose from an attempt by him and his wife to build a half-way house in the inner city of Chattanooga. Unexpected legal problems caused the venture to fail. His earnings decreased to almost zero. He is now making about $14 per hour. His take home pay, before the $100 chapter 13 payment, is about $350 per week. His wife's take home pay is about $500 per week. His military

pension is about $800 per month. He stopped making the payments when the bankruptcy court released the house to foreclosure because that relieved him from the duty to pay, according to his lawyer.

When questioned by the court, the debtor testified that: (1) he did not remember having a written marital dissolution agreement at the time he asked about designating payments as alimony; (2) there was no discussion of a connection between alimony and the provision that payments would end on Ms. Westerfield's death or remarriage; (3) his concern about alimony related to the military pension — specifically, he wanted the one-half paid to Ms. Westerfield to be income to her and not him; (4) his alimony concern was not related to the mortgage payments; (5) he has always deducted the mortgage interest for income tax purposes.

The court's discussion begins with the sixth circuit's decision in *Calhoun. Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103 (6th Cir. 1983). That case involved the debtor's obligation to pay joint debts directly to the creditors. The question was whether the obligation could be discharged under § 523(a)(5) because it was not actually in the nature of support. The sixth circuit created a three part test for deciding the question:

> (1) The court must decide whether the parties or the state court intended the obligation to provide support. In making this decision, the bankruptcy court should consider factors the state courts would apply in deciding whether to require support.
>
> (2) The court must decide whether the obligation will provide *necessary* support to the former spouse. It is not sufficient that payment of the debts will support the former spouse by relieving him or her of the debt burden. The payment must provide support needed by the former spouse or children to meet daily needs. In other words, if the obligation was imposed so that the former spouse would be able to meet daily needs or to maintain a particular standard of living, but the obligation is no longer needed for the former spouse to meet daily needs, then the obligation is not support for the purposes of § 523(a)(5).
>
> (3) The court must consider whether the amount is so excessive that it is manifestly unreasonable under traditional concepts of support. The decision depends on the earning power and financial status of the debtor at the time the

> state court imposed the obligation. The unreasonable portion of the obligation could not have been intended as support and is dischargeable.

*Calhoun*, 715 F.2d 1103, 1109-1110.[1]

The third step of the *Calhoun* analysis, the reasonableness test, can easily be answered in Ms. Westerfield's favor. The third step is separate from the first step in the analysis, the intent test. Nevertheless, the third step still seems to deal with the intent of the parties and the state court at the time of the divorce. For example, suppose the divorce decree or the parties' agreement required the debtor to pay alimony of $5,000 per month, but the ex-spouse and the state court knew the debtor was not able to pay more than $1,000 per month, and they did not reasonably expect debtor would ever be able to pay more. The parties and the state court could not have intended the additional $4,000 as support because they did not expect the debtor to pay it. Footnote 12 leaves little doubt that this is the meaning of the reasonableness test. *Calhoun*, 715 .F.2d 1103, note 12. At the time of the divorce, the debtor was earning about $40,000 per year not counting his military pension. The divorce reduced the military pension by awarding part of it to Ms. Westerfield, but the debtor still expected to be able to make the future mortgage payments. Indeed, the debtor made the mortgage payments for eleven years and would still be making the payments if not for his recent financial troubles. Thus, the third step of the *Calhoun* analysis allows the court to conclude that the debtor's duty to pay the mortgage debt is a domestic support obligation to Ms. Westerfield.

The first step in the analysis is the intent test. The intent to provide support does not mean simply the subjective intent of either spouse or the state court. The court must consider a number of facts relevant to whether the obligation would function as support. *Smith v. Smith (In re Smith)*, 131 B.R. 959, 962–963 (Bankr. E. D. Mich. 1991). The evidence left no doubt that the parties and the state court intended the debtor's obligation to pay the mortgage debt to be support for Ms. Westerfield. The debtor and Ms. Westerfield intended that she would continue to live in the house. Both understood that the debtor was required to pay the mortgage debt so that she could live in the house. The debtor and Ms.

---

[1] The sixth circuit separated the third step into two parts to make this a four part test.

Westerfield had been married for 28 years. During the marriage Ms. Westerfield had earned substantial income as a medical technician. Before the divorce she was earning about $30,000 annually. Around the time of the divorce she was attending school in clinical pastoral education, which is training for hospital chaplains and similar jobs. Career changes regularly involve the risk of reduced income temporarily if not permanently. Furthermore, Ms. Westerfield's education for her new career involved an internship or residency during which she had no earnings. At the time of the divorce, she had just completed the residency and was looking for work, or she was headed toward the residency. The divorce entitled Ms. Westerfield to one-half of the debtor's military pension, but that should have been no more than $800 monthly at the time of the divorce. Furthermore, the pension payment would end on the death of the debtor. The result is that when the parties were divorced, Ms. Westerfield needed the debtor's payments on the mortgage debt so that she could continue residing in the house.

The marital dissolution agreement also includes traditional indicia of support: it terminates the debtor's obligation on the death or remarriage of Ms. Westerfield. *Sorah v. Sorah (In re Sorah)*, 163 F.3d 397, 402 (6th Cir. 1998); *Fitzgerald v. Fitzgerald (In re Fitzgerald)*, 9 F.3d 517 (6th Cir. 1993). Furthermore, the structure of the marital dissolution agreement leads the court to conclude that the debtor's obligation to pay the mortgage debt was intended as support for Ms. Westerfield. The agreement appears to follow a typical pattern. The personal property was generally awarded to the person who owned it before the marriage, acquired it for personal use during the marriage, or regularly used it during the marriage. The award of the timeshare and recreational lots may have been an exception, but that is not clear. The obligation to pay a debt was usually assigned to the person who had received the benefit from incurring the debt. The debtor was ordered to pay some credit union debts that may have been incurred for the benefit of both parties or primarily for Ms. Westerfield's benefit. As to these obligations, the debtor's ability to pay was more certain, and payment by him would protect Ms. Westerfield from loss. Other provisions were clear exceptions from this typical pattern. The debtor agreed to continue supporting their daughter while she was in college. The debtor agreed to maintain life insurance for the benefit of Ms. Westerfield and the children. The debtor agreed to maintain health insurance for Ms. Westerfield for three

years. The debtor agreed to pay the mortgage debt secured by the marital home that was awarded to Ms. Westerfield. These exceptions fit the mold of support, especially the debtor's duty to pay the mortgage debt, even if some of the exceptions do not qualify as a domestic support obligations.

The second step of the *Calhoun* analysis is the necessary support test that has become known as the present needs test. It takes into account the financial situation of the ex-spouse creditor *at the time of the bankruptcy*. *Singer v. Singer (In re Singer)*, 787 F.2d 1033, 1038 (6th Cir. 1986) (concurring opinion). If the financial circumstances of the ex-spouse creditor have improved to the point that part of the debtor's obligation is no longer required for necessary support, then that part of the debtor's obligation is not actually in the nature of support and can be discharged. *Calhoun*, 715 F.2d 1103, 1109, notes 9 & 10.[2]

In the *Fitzgerald* decision, the sixth circuit limited the use of the present needs test, but the opinion is not clear as to the key distinctions from *Calhoun*. The court seemed to distinguish *Calhoun* on the ground that it involved an obligation not labeled as alimony, maintenance, or support. This leads to interpreting *Fitzgerald* as holding that the present needs test does not apply when: (1) the obligation was intended to provide support, and (2) the divorce decree or the parties' agreement labeled the obligation as alimony, maintenance, or support.[3] The *Calhoun* opinion, however, says the obligation in question was labeled as alimony or support. *Calhoun*, 715 F.2d 1103, 1105.The court in *Calhoun* did not rely on inconsistencies in the Calhouns' agreement as making the alimony label meaningless. The end of the *Calhoun* opinion criticized the bankruptcy court for putting the burden of proof on the debtor because the obligation was labeled as alimony or support. *Calhoun*, 715 F.2d 1103, 1111.

*Fitzgerald* makes the label too important if it bars use of the present needs test only when the obligation is labeled as a form of support. That result would be a striking departure from the reasoning

---

[2] Whether the obligation provided necessary support at the time of divorce is part of the intent test. *Singer v. Singer (In re Singer)*, 787 F.2d 1033, 1035 (6th Cir. 1986); *Smith v. Smith (In re Smith)*, 131 B.R. 959, 963-963 (Bankr. E. D. Mich. 1991).

[3] The court recited this interpretation in an earlier decision, but it did not control the outcome. *In re Boller*, 393 B.R. 569, 575-576 (Bankr. E. D. Tenn. 2008).

of *Calhoun*. The label should not have too much influence on the outcome in light of the current practice in divorce cases: legal factors can lead the parties or the court to give the obligation a label opposite its true function as understood by the parties or the state court.

The court in *Fitzgerald* could have been making a simpler point. The alimony label added to the weight of the evidence in favor of the debtor's ex-wife. The label was a signpost that was not contradicted in the parties' agreement. The trial court should have been concerned with whether other evidence proved the signpost to be wrong. The other evidence left no doubt that the signpost was correct.

*Fitzgerald* noted another distinction. The obligation was payable directly to the debtor's ex-wife, but the obligation in *Calhoun* was payable directly to creditors. This distinction also makes sense as dealing with the weight of the evidence. Payment directly to the ex-spouse is stronger evidence of a support obligation than payment directly to creditors.

Other language in *Fitzgerald* suggests that the real distinction from *Calhoun* was the strength of the evidence, not including present needs, in favor of finding the obligation to be actually in the nature of support. Since the other evidence left no doubt the obligation was intended as support and actually provided support at the time of the divorce, the trial court was not required to apply the present needs test. This broader interpretation of *Fitzgerald* limits the present needs test on a more meaningful basis than whether the obligation was labeled as alimony, maintenance, or support.[4]

The court also fails to see how the present needs test could have completely survived the 1994 enactment of the original version of § 523(a)(15). If the debtor's obligation was no longer needed by the ex-spouse under the present needs test, the obligation would have been dischargeable under § 523(a)(5). On the other hand, the court could have weighed the debtor's current financial situation against

---

[4] Applying the third step of the *Calhoun* analysis, the reasonableness test, does not contradict the court's interpretation of *Fitzgerald*; the reasonableness test focuses on the intent and effect of the debtor's obligation at the time of the divorce.

the ex-spouse's present needs and excepted the debt from discharge under § 523(a)(15).[5] 11 U.S.C. § 523(a)(15)( 2004).

The court's interpretation of *Fitzgerald* is supported to some extent by the sixth circuit's later decision in *Sorah v. Sorah (In re Sorah)*, 163 F.3d 397 (6th Cir. 1998). In *Sorah* the debtor's obligation met three traditional state law indicia of support: (1) the obligation was identified in the divorce decree or the parties' agreement as alimony, maintenance, or support; (2) the obligation was payable directly to the ex-spouse creditor; (3) the obligation ceased on such events as the ex-spouse creditor's death, remarriage, or eligibility for Social Security benefits. The sixth circuit held that the these three traditional indicia of support created a presumption in favor of the ex-spouse creditor. The presumption prevented the debtor from introducing any contrary evidence under the intent test or the present needs tests and left the debtor with only one possible defense, unreasonableness under the third step of the *Calhoun* analysis.[6] *Sorah*, 163 F.3d 397, 401–402.

The *Sorah* presumption is stronger than the rule of *Fitzgerald*, but the reasoning is similar. The court relied on the strength of the evidence in favor of the ex-spouse creditor as grounds for requiring the debtor to rebut the evidence.[7] In the course of the *Sorah* decision, the sixth circuit said:

> In *In re Fitzgerald,* 9 F.3d 517, 520 (6th Cir.1993), this court noted that the *Calhoun* standard had been too expansively applied by the bankruptcy courts, and held that the "present needs" of the non-debtor spouse should not be considered when the obligation was intended as support.

---

[5] In chapter 7, 11, and 12 bankruptcy cases, the current version of § 523(a)(15) lessens the need for the federal courts to undertake the difficult task imposed by § 523(a)(5). 11 U.S.C. § 523(a)(15).

[6] Ms. Westerfield is not entitled to the *Sorah* presumption because the divorce decree and the marital dissolution agreement do not include the second traditional indicia of support, payment directly to Ms. Westerfield.

[7] The reverse *Sorah* reasoning does not apply for the debtor's benefit. His obligation includes a traditional indicia of support – termination on the death or remarriage of Ms. Westerfield. The no-discharge provision is an agreement that the no-alimony provision does not control discharge under bankruptcy law. It does not control any issue, such as the question of whether an obligation is actually in the nature of support. *Compare In re Boller*, 393 B.R. 569 (Bankr. E. D. Tenn. 2008). Thus, it makes no difference whether the no-discharge provision refers to both § 523(a)(5) and (a)(15).

> . . . Thus *Fitzgerald* stands for the proposition that a state court's award of alimony is entitled to deference when labeled and structured as such.

*Sorah*, 163 F.3d 397, 400–401. The second sentence deals with the implication of *Fitzgerald* for cases such as *Sorah*. The first sentence interprets *Fitzgerald's* rule against applying the present needs test. It does not limit the *Fitzgerald* rule to cases involving an obligation labeled as alimony, maintenance, or support. In summary, *Fitzgerald* requires the court to consider all the evidence other than the present needs of the ex-spouse creditor. If the evidence leaves no doubt the obligation was intended to provide support and actually provided support at the time of the divorce, then the court should not apply the present needs test. The result in this case is that the court need not apply the present needs test.

The court concludes that the debtor's obligation to pay the mortgage debt is a domestic support obligation under bankruptcy law. That conclusion does not prevent the debtor from asking the state court to modify his obligations under the divorce decree and marital dissolution agreement. *Gianakas v. Gianakas (In re Gianakas)*, 917 F.2d 759 (3d Cir. 1990); *Martin v. Wilbur (In re Wilbur)*, 304 B.R. 521 (Bankr. M. D. Fla. 2003).

Ms. Westerfield's refinancing of the mortgage debt creates uncertainty as to what the debtor is required to pay to fulfill this obligation. *Robinson v. Robinson (In re Robinson)*, 921 F.2d 252 (10th Cir. 1990); *Lewis v. Trump (In re Trump)*, 309 B.R. 585 (Bankr. D. Kan. 2004). The court will leave that question for later consideration. The debtor has not made post-petition payments that were required for confirmation and are crucial to obtaining the intended benefit from his chapter 13 case. The court will allow the debtor time to file an amended plan.

# # #